IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

NHUNG N. LE,                        )
                                    )
                    Plaintiff,      )      CIVIL ACTION
                                    )
v.                                  )      No.  13-1293
                                    )
SPIRIT AEROSYSTEMS, INC.,           )
                                    )
                    Defendant.      )
_____)

## MEMORANDUM AND ORDER

Before the court are the following: Spirit's motion for summary judgment and memorandum in support (Docs. 35, 36, 38); Le's response (Docs. 43, 46); and Spirit's reply (Doc. 50). The court commends counsel on their well-written submissions.

### I. Introduction

Nhung Le began employment with Spirit in 2007. In 2011, she complained to Spirit's Equal Employment Opportunity (EEO) office that her supervisor was sexually harassing her. Spirit investigated and issued a warning to the supervisor for making inappropriate comments. Le thereafter had a different supervisor. Between August 2012 and January 2013, Le received five disciplinary actions and her employment was terminated.

Le claims she was subjected to a hostile work environment, sexual harassment, disparate treatment, and retaliatory discharge in violation of Title VII and the Kansas Act Against Discrimination. She further asserts common law claims for intentional infliction of emotional distress and wrongful termination in violation of public policy. Spirit moves for summary judgment on all of Le's claims.

## II. **Uncontroverted facts**.

Spirit designs and builds aircraft parts. Le began her employment with Spirit on January 12, 2007, as a composite mechanic. Her job involved fabrication of composite parts for aircraft.

Spirit has a written policy against discrimination and workplace harassment on the basis of sex. The policy also prohibits retaliation against anyone for filing a complaint of discrimination or harassment. Employees are responsible for reporting workplace discrimination to either a manager, Human Resources, Ethics Point (an online reporting system), or the HR Compliance-EEO office. The policy allows an employee to report a concern outside their reporting chain of command and to bypass individuals whom they believe have caused discrimination or harassment. When Spirit receives a complaint, its EEO office conducts an investigation. Employees are responsible for cooperating with the investigations. If a complaint is substantiated, Spirit's policy is to take prompt and effective remedial action to deter any future misconduct.

Spirit's discrimination policy is published on the company's intranet. Employees typically receive training on the policy upon their hire and periodically thereafter. Le received training on the policy on May 6, 2008, October 15, 2009, November 15, 2010, September 14, 2011 and September 15, 2012.

Spirit's Disciplinary Guidelines.

Spirit's disciplinary guidelines set forth Spirit's policies and procedures for imposing discipline. According to the guidelines, Spirit may handle less serious misconduct under the concept of

progressive disciplinary action, meaning increasingly severe disciplinary actions for subsequent work rule violations, including possible termination after multiple infractions. Under the policy Spirit reserves the right to omit or repeat a disciplinary step, or issue discipline out of sequence, depending on the circumstances.

Employees may be terminated for "generally unacceptable conduct" when the employee accumulates four disciplinary actions within a year and then receives a fifth disciplinary action for any reason in the following year.

Le received a documented verbal warning from manager Jose Sanchez on July 26, 2010, for misuse of company time and failure to follow instructions. The discipline memo states that Le was missing from her work area on two separate occasions and that when she was asked about it she said she was "walking around."

On September 11, 2010, Le received a written warning from manager Pamela Brown for misuse of company time and failure to follow instructions. The discipline memo states that from August 16 through August 27, Le was consistently out of her work area during work hours and that then when she was asked about it, Le said she was walking around. This disciplinary memo was later removed by Brown. According to Le, it was removed because Brown realized she had ordered Le to go to another area of the plant or because Le's work required her to look for a part in another area of the plant.[1]

_____

[1] This is a construction of the evidence in the light most favorable to Le.

Le's deposition was apparently conducted with the aid of an interpreter. Nevertheless, many of Le's responses in the deposition transcript are set forth in broken English. When Le was asked about the above incident and whether Brown talked to her about staying in

Le received a documented verbal warning on March 23, 2011, for an unauthorized mid-shift departure. The discipline memo states that Le clocked out prior to the end of her shift without notifying management. The discipline memo was issued and signed by Le's first-level manager at the time, "JG,"[2] although it had been initiated by another manager who was filling in for JG. JG was not at work on the night in question and first-level manager Eric McCosh had been overseeing the crew in his absence. McCosh initiated the discipline. JG never initiated any discipline against Le.

In the area where Le worked, first-level managers typically rotated among the different shifts. It was also common for first and second-level managers to transfer among the different areas within the plant.

From January 2011 through June 2011, Le worked on second shift reporting to manager JG. During that time, first-level manager Ron Capps supervised a first-shift crew. Capps received feedback from employees that Le's work performance on second shift was deficient in

---

her work area, Le's response was [according to the transcript]: "Yes. Yes, she, she took me but she can't remember. She take me someplace else. [ ] Okay, my job is that me to looking for the part. All over department. [] But she's sending me over there, but she didn't remember that I went with her order. She report me as missing. So that's why – [] that's reason why she realized she make mistake, so she changing the information." (Doc. 46-1, Le Depo. at Pp. 112-13.)

In contrast to Le's suggestion that the discipline was removed because it resulted from an error by Brown, an email from Brown on September 15, 2011 indicates she removed the disciplinary memo based on Le's expressed willingness to change her behavior and to do better. (Doc. 36-12 at p.4).

[2] "JG" was the manager against whom Le asserted a harassment complaint. By agreement of the parties and pursuant to a protective order, the parties' non-sealed filings refer to him only by his initials.

several respects. Capps documented the performance problems in a March 28, 2011 email to JG. In the email, Capps stated that Le "just isn't getting the job done (on several different fronts)." JG verbally coached Le regarding the performance issues identified by Capps but did not issue formal discipline.

Le's 2011 EEO Complaint.

Le contacted Spirit's EEO office on July 15, 2011, via certified mail, with a complaint regarding JG. At the time Le reported these allegations JG was no longer her direct manager. Le had previously mentioned JG's inappropriate comments to the union business representative and the shop steward. She had unsuccessfully tried to contact the EEO office a couple of weeks prior to sending the certified letter.

EEO investigator Lucretia Taylor opened an investigation after receiving the letter. Taylor interviewed Le on July 18, 2011. In her statement, Le said that JG had made three inappropriate comments to her during the six months be supervised her in 2011. First, she said that in approximately January 2011, JG made a comment about the length of time since Le had had sex with a man. Second, in about early February 2011, JG asked Le if she would marry him, to which she responded that he was too old. JG allegedly said Le would be "satisfied" and took off his wedding ring and gave it to her. Third, in June 2011, JG made comments regarding Le's breast implants, including asking her if her nipple sensitivity had returned and to let him know when it returned and he would "help her out."

Le also stated that she heard JG make inappropriate comments to a female coworker at some point in the past when JG was on first-

shift. That coworker was interviewed by an EEO investigator, but she denied that JG ever harassed her.

After interviewing Le, Taylor interviewed eight other employees, including JG. JG admitted that he engaged in a conversation with Le regarding her breast implants and that he had an inappropriate conversation with another female employee. None of the other witnesses interviewed confirmed Le's other allegations.

Because the investigation substantiated that JG had engaged in inappropriate conduct, Spirit took disciplinary action in the form of issuing a verbal and written warning to JG on October 3, 2011. In addition, Taylor spoke with JG's supervisor to direct that JG should not be assigned to supervise Le's crew in the future when first-level managers rotated among the shifts.

After June 2011, JG was never Le's direct manager. There were occasions, however, when Le's direct manager was absent and JG filled in as the crew manager. Le admits that on those occasions JG never said anything inappropriate to her, did not take any disciplinary action against her, and did not treat her differently from other employees. Le said that when JG was her substitute supervisor she would take sick leave and go home.

Subsequent to Le's 2011 EEO complaint, no other employee has complained about JG engaging in discriminatory or harassing behavior. Le confirmed to EEO that JG did not harass her after the July 2011 complaint.

In February 2012, manager Ron Capps notified HR that a union steward had reported to him that Le said JG was still harassing Le and other women. Taylor conducted additional investigation and interviewed

Le. Le stated that JG "has not done anything recently" and that she had not seen JG for several weeks. Le did not identify any other female employees that JG allegedly harassed. To ensure that JG was not engaging in any inappropriate conduct, Taylor randomly interviewed several female employees from the area where JG worked. None of them reported any inappropriate conduct by JG.

Le's Subsequent 2011 Discipline.

In approximately July 2011, JG rotated to first shift and in July or August 2011, Ron Capps became Le's first-level manager on second shift.

Capps issued Le a documented verbal warning for performance deficiencies on August 3, 2011, after Capps became aware that Le's work product required extensive re-work by a coworker and, in another instance, that she damaged a part beyond repair such that it had to be replaced. Le does not dispute the poor work quality but contends she was required to work on a part for which she had not been adequately trained.

The collective bargaining agreement between Spirit and the International Association of Machinists (IAM) allowed managers to exclude employees from overtime for 90 days following discipline for poor work quality. Capps excluded Le from overtime for a 90-day period pursuant to this provision after the August 3, 2011 discipline.

In 2012, after filing her EEO complaint, Le worked more than 275 hours of overtime, which was more than in any year prior to her EEO complaint.

Le's 2012 and 2013 Discipline.

On August 9, 2012, first-level manager Judy Murphy saw Le

without her safety glasses on while she was working. Safety glasses are mandatory personal protective equipment for employees in the manufacturing areas of the plant. Rather than issuing discipline, Le's first-level manager at the time, Joshua Neally, coached Le about the importance of wearing safety glasses.

On August 13, 2012, second-level manager Doris White saw Le watching a You Tube video on the internet during work hours. White reported Le's conduct to Neally, who initiated and issued a documented verbal warning for misuse of company time. Because Neally as a temporary first-level manager could not sign discipline forms, the form was signed by manager Mardy Reece.

On August 17, 2012, Neally witnessed Le in her work area without safety glasses on. Neally initiated and issued a written warning (again signed by Reece), which was progressive discipline for "personal conduct" after the August 13, 2012 documented verbal warning.

Le testified that she saw "a lot of people" using their computers to view non-work web sites but said "I don't know their name[s]." She also testified that "a lot of people don't wear the safety glass[es]" at work, but she could not name any such persons.

On September 12, 2012, second-level manager White and first-level manager Reece received a report that Le was on her cell phone in the bathroom talking loudly during work hours. White and Reece went in the bathroom and heard Le on her phone in a bathroom stall. Reece initiated and issued Le a second written warning for inappropriate behavior and language. The discipline memo stated that Le was talking very loudly and using inappropriate language, and that when she came

-8-

out of the stall she walked away from the managers without answering their questions.

On October 15, 2012, first-level manager Larry Morse issued Le a three-day suspension for misuse of company time. The discipline memo states that Morse saw Le on a non-work related website during work hours.

Le's suspension was progressive discipline under Spirit's disciplinary guidelines. It was Le's fourth disciplinary action within a few months. The disciplinary memo stated that if Le received any other discipline in the following twelve months, she would be terminated for general misconduct.

After receiving the suspension, Le filed for leave under the Family Medical Leave Act (FMLA), citing stress. She was authorized to return to work by her psychologist on January 8, 2013.

On January 14, 2013, second-level manager Terrance Huelsman saw Le at her work station when employees were supposed to be present in another area for mandatory stretching exercises. Le asserts that her supervisor failed to inform her about the stretching exercises after she returned from FMLA leave.

On January 22, 2013, second-level managers White and Huelsman saw Le in the cafeteria with lunch prior to the start of her scheduled lunch time. When White confronted her with the fact that she was there earlier than her scheduled time, Le said, "Oops," and returned to her work area. Le contends that upon returning to her work area, she and other workers realized that the clock in that area was 3 to 4 minutes fast. White notified Capps of Le's conduct.

White and Huelsman did not see any other employees from Le's

-9-

crew in the cafeteria prior to their scheduled lunch time. Capps was not aware of any other employees from Le's crew in the cafeteria prior to the start of their lunch time. Capps initiated and issued Le's fifth disciplinary action on January 31, 2013 for misuse of company time. This disciplinary action resulted in her termination.

Le alleged on her termination discipline form that she went to lunch early based on a clock in her work area that was running fast. Le talked with coworker Randy Nobles and the union steward about the clock running fast, and she submitted a statement from Nobles to the union. Neither the union steward nor any other employee, however, confirmed Le's account of a fast-running clock to the Spirit managers.

Spirit uses loud bells to notify employees of the start of breaks, lunch, and the end of shifts. Le states in a declaration that in her area she "had to wear earplugs due to the very noisy machines that I was working around, and at times I was unable to hear the bell."

There were two incidents listed on Le's termination form: the January 14 and the January 22 incidents.

As the foregoing indicates, four different first-level managers initiated and issued discipline to Le in 2012 and 2013: Neally, Reece, Morse and Capps. These same managers also issued 31 disciplinary actions to 22 other employees for personal conduct and/or unacceptable performance. Twenty-one of these disciplinary actions were for personal conduct including: talking on a personal cell phone during work hours; inappropriate behavior including loud and disruptive language; failure to wear appropriate safety glasses; leaving mid-shift without notifying management; and spending time on non-work

-10-

related web sites during work hours. Of the 22 employees (other than Le) who received discipline, only one had previously filed an EEO complaint. As to that one employee, the complaint had been filed about three years before the discipline was imposed.

In 2012 and 2013, Spirit terminated twelve people other than Le for generally unacceptable conduct. Of those twelve, one of the employees had made an EEO complaint more than three years prior to his termination.

### III. <u>Summary Judgment Standard</u>

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. <u>Adamson v. Multi Community Diversified Svcs., Inc.</u>, 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

IV. <u>Discussion</u>.

A. <u>Hostile work environment</u>. Le contends she suffered discrimination in the form of a hostile work environment. Doc. 32 at 6. She argues that JG's comments to her when he was her supervisor were objectively and subjectively offensive and are sufficient for a trier of fact to find a hostile work environment. Spirit argues that even accepting the allegations concerning JG's conduct as true, the conditions were not sufficiently severe and pervasive to support a hostile work environment claim.

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer to discriminate against an individual in the terms, conditions and privileges of employment because of that individual's sex. 42 U.S.C. § 2000e-2(a)(1). Sexual harassment that is so severe or pervasive as to alter the conditions of an individual's employment and create an abusive working environment violates this provision. <u>See Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786 (1998); <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986).

In order to be actionable, a sexually objectionable environment must be both objectively and subjectively abusive. It must be one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so. <u>Faragher</u>, 524 U.S. at 787. Courts determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. <u>Faragher</u>, 524 U.S. at 788.

-12-

These standards are intended to be sufficiently demanding that Title VII does not become a general civility code. <u>Faragher</u>, 525 U.S. at 787. The Supreme Court has made it clear that "conduct must be extreme to amount to a change in the terms and conditions of employment...." The standard "will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." <u>Faragher</u>, 524 U.S. at 788.

The discriminatory conduct of which Le cites evidence consists of inappropriate comments by JG on three occasions in a six-month period.[3] JG also admitted to having engaged in an inappropriate conversation with another female employee at some unspecified time. By itself this level of frequency does not suggest an environment "permeated with" discriminatory conduct sufficient to alter the conditions of Le's employment. <u>See</u> <u>Morris v. City of Colo. Springs</u>, 666 F.3d 654, 664 (10th Cir.2012) ("An employer creates a hostile work environment when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

---

[3] Le's summary judgment brief states that "Le testified at her deposition that JG was sexually harassing her the whole time that he supervised her." (Doc. 46 at 4). This vague assertion, which is not set forth in the factual section of Le's brief and is not supported by any citation to the record, is not taken as true for purposes of summary judgment. <u>See</u> D. Kan. 56.1(b)(2) (facts in opposing memorandum must be supported by references to the record). It also appears to contradict other portions of Le's deposition where, after recounting the three comments noted above, Le said "that is the only three comments he [JG] made." Doc. 46-1 at 4. <u>Cf</u>. <u>Hernandez v. Valley View Hosp. Ass'n.</u>, 684 F.3d 950, 959 (10th Cir. 2012) (plaintiff's recitation of details was sufficient to show pervasive harassment; it included more than a mere assertion of continuous abuse with no record citation to any content, context or date of inappropriate comments).

create an abusive working environment."); <u>Sandoval v. City of Boulder, Colo.</u>, 388 F.3d 1312, 1327 (10th Cir. 2004) ("The two comments mentioned by Sandoval could not by themselves support a finding that her working environment was 'permeated' with sexist abuse.").

The nature of the comments likewise does not tend to show a level of severity sufficient to support a claim. According to Le's testimony JG's conduct consisted solely of making these three inappropriate comments; she does not claim that he engaged in any sort of physical touching or intimidation, which would be an indication of greater severity. No evidence is cited that the statements were made in a threatening or hostile manner. Nor does she cite evidence that JG otherwise treated her less favorably than other employees. No evidence is cited that the comments constituted some type of quid pro quo offer of greater benefits or more lenient treatment. And while three comments of this kind in a six-month period is not trivial, neither can it be described as a "steady barrage of opprobrious comments." <u>Cf</u>. <u>Morris</u>, 666 F.3d at 654 (citing <u>Chavez v. New Mexico</u>, 397 F.3d 826, 832 (10th Cir. 2005)).

That is not to say the comments were innocuous. Two of them arguably included a suggestive solicitation for sex. A reasonable person could find that JG's comments were offensive, and the evidence would support a finding that Le found them offensive. But a "recurring point" in the Supreme Court's cases on hostile-work-environment is that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Gaff v. St. Mary's Reg. Med. Center</u>, 506 Fed.Appx. 726, 728, 2012 WL 6604579 (10th Cir. 2012)

-14-

(citations omitted). The three instances cited here are too isolated to be described as part of a continuing pattern. Le also cites no evidence that an alteration in the terms and conditions of her employment resulted from the improper comments. She does allege one concrete effect on her work – on those occasions when JG filled in as her supervisor after the EEO complaint, she would take sick leave. Even so, Le does not tie the taking of leave to any ongoing instance of inappropriate behavior by JG. It is uncontroverted that after she made the EEO complaint JG did not direct any additional inappropriate comments towards her.

Considered as a whole the circumstances cited are not sufficient to permit a finding of a workplace permeated with discriminatory intimidation, ridicule or insult. Spirit's motion for summary judgment will be granted with respect to Le's Title VII hostile work environment claim.[4] Cf. Trujillo v. Univ. of Colo. Health Sci. Ctr., 157 F.3d 1211, 1214 (10th Cir. 1998) (to reach the level of a hostile work environment, the misconduct must amount to more than "a few isolated incidents"; instead a plaintiff must show "pervasive or severe harassment."). Inasmuch as the same elements apply to Le's hostile environment claim under the KAAD, summary judgment is granted to Spirit on that claim as well. See Labra v. Mid-Plains Const., Inc., 32 Kan.App.2d 821, 90 P.3d 954 (2004) (applying federal cases as "persuasive authority" on KAAD claim).

B. Retaliation claim. Le also claims Spirit retaliated against

---

[4] Spirit's assertion of an affirmative defense pursuant to the Supreme Court's Ellerth and Faragher cases (Doc. 36 at pp. 20-23) is moot in view of the grant of summary judgment on Le's hostile environment claim.

her for filing a complaint against JG. She contends she was subject to greater scrutiny than others and suffered disparate treatment in the form of repeated disciplinary reprimands, loss of overtime, and wrongful termination from employment because of her discrimination complaint. (Doc. 32 at 4). Spirit seeks summary judgment on the claim, arguing Le has shown no evidence of a causal connection between her EEO complaint and any subsequent discipline. Moreover, it claims Le has shown no evidence of pretext for what Spirit contends were legitimate reasons for her discipline and termination.

Title VII makes it unlawful to retaliate against an employee for having made a claim or opposed any unlawful practice under Title VII or for having assisted in a charge, investigation or proceeding under Title VII. 42 U.S.C. § 2000e-3(a).

Because Le's retaliation claim is based on circumstantial evidence, the court applies the burden-shifting approach of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under that framework Le must first establish a prima facie case of retaliation. If she does so, the burden shifts to Spirit to articulate a legitimate non-retaliatory reason for the adverse employment action. If Spirit articulates such a reason, the burden shifts back to Le to show a genuine issue as to whether Spirit's explanation is a pretext. <u>See Somoza v. Univ. of Denver</u>, 513 F.3d 1206, 1211 (10th Cir. 2008).

<u>Prima facie case</u>.

To show a prima facie case, Le must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between her protected activity and the adverse employment action. <u>Davis v. Unified School Dist. 500</u>, 750

F.3d 1168, 1170 (10th Cir. 2014). Spirit concedes that Le has satisfied the first two elements but argues she fails to cite evidence of a causal connection between her complaint and the subsequent discipline and termination.

Le relies on temporal proximity to establish a causal connection between her protected activity and the adverse disciplinary actions against her. (Doc. 46 at 11). Courts have repeatedly recognized that temporal proximity can be "relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive." Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006). But when a plaintiff relies on temporal proximity alone, an inference of retaliation is ordinarily justified only if the adverse action is "very closely connected in time to the protected activity." Metzler, 464 F.3d at 1171 (quoting Anderson v. Coors Brewing, 181 F.3d 1171, 1179 (10th Cir. 1999)).

Le's initial complaint against JG was made on or around July 15, 2011. About a month later, on August 23, 2011, she was disciplined by Capps for poor work performance. This one incident, which led to a 90-day denial of overtime for Le, falls within a time frame that would justify an inference of retaliation.[5] Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1172 (10th Cir. 2006) (one and a-half month

---

[5] The August 2011 incident fails to support a claim for other reasons which the court discusses infra.

Le erroneously asserts that Capps' August 2011 discipline was based on Le's poor work quality in March 2011. Doc. 46 at 9-10. The March 2011 work quality incident was documented in an email from Capps to JG dated March 28, 2011. Doc. 38-10 at 3. But neither Capps nor JG imposed discipline on Le in that instance. The August 2011 discipline resulted from Le's substandard work on July 14 and 21, 2011. Doc. 36-12 at 6.

period could establish causation). But the next discipline Le incurred
was almost one year later – August 13, 2012 – when she was warned for
watching You Tube at work. That length of time does not justify any
inference of retaliation. See Meiners v. Univ. of Kan., 359 F.3d 1222,
1231 (10th Cir. 2004) (no reasonable inference of retaliatory motive
from nearly 3 month gap between complaint and adverse action). She
then incurred three disciplinary incidents in the ensuing three-month
period (August-October 2012). Again, the temporal proximity between
her July 2011 complaint and these incidents does not reasonably
justify any inference of retaliation. Finally, about three months
beyond her October 2012 discipline, she received the discipline that
prompted her termination. Under Spirit's policies only the incidents
in 2012 and 2013 were relevant to the termination, meaning the one
disciplinary incident that was close in time to her discrimination
complaint did not factor in her termination. The timing of these
incidents as a whole suggests no retaliatory motive, nor does it
suggest a pattern of retaliation that culminated in her termination.
Cf. Marx v. Schnuck Mkts. Inc., 76 F.3d 324, 329 (10th Cir. 1996)
(recognizing that pattern of discrimination beginning soon after
protected activity, which only later results in discharge, may support
an inference of retaliation); Meiners, 359 F.3d at 1232 (rejecting
pattern claim). This is true even if the court considers the date that
Le's complaint resulted in discipline to JG – October 3, 2011 – as a
potential event that could prompt retaliation. Le did not incur any
discipline thereafter until August 13, 2012, some ten months after
that event.

Le appears to offer several other dates as relevant starting

-18-

points for determining whether retaliation occurred. (See Doc. 46 at 10-11). For example, she mentions Capps' report to EEO in March 2012 that a union rep told him Le was again complaining of sexual harassment by JG. It is not clear from Le's brief what her version of that event is – Le does not explain what she said or did in connection with that alleged complaint.[6] Regardless, the fact that Le incurred discipline five months after it occurred does not, standing alone, reasonably suggest a retaliatory motive. See Roberts v. Int'l. Bus. Machines Corp., 733 F.3d 1306, 1311 (10th Cir. 2013); McKenzie v. City and County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005) (five-month delay alone did not give rise to inference of retaliation).

Le's brief also asserts that she was falsely accused of stealing at work in April 2012 and accused of offering to do an improper favor for an employee in May 2012. Doc. 46 at 11. The briefs indicate that Le incurred no discipline for these incidents. The parties' factual statements on summary judgment contain nothing about the incidents or about the surrounding circumstances. They are mentioned by Le only in the argument portion of her brief. The deposition excerpts attached to the briefs contain only cryptic references to these incidents. It is not clear from the record who made any such accusations or, for

---

[6] Spirit's exhibits include an EEO statement apparently written and signed by Le on March 3, 2012. Doc. 38-2. Among other things, it said: "[JG] hasn't done anything recently. ...[H]e stared at me in [an] angry or intimidating manner. This was after my original complaint was filed. I haven't seen him for the last three weeks. ... I think the reason [the union rep] called was that [JG] still mess[es] with a woman at BR. He is still flirty with a woman in the big layup room. ... [The union rep] is who told me the story. ... [JG] doesn't talk [dirty?] to me anymore. [JG] has had affairs with a lot of women out here at Spirit. ...[O]ne works 1st shift BR. That is the only woman I know, the rest is gossip. ... [JG] told me to touch [illegible]."

that matter, what occurred during the incidents. No showing is made that the incidents have any bearing or relevance whatsoever to the claims asserted. These incidents cannot reasonably serve as a baseline for determining whether retaliation occurred nor can they be viewed as examples of retaliation given the lack of factual support describing the incidents.

In sum, except for the disciplinary incident in August 2011, Le has failed to establish a prima facie case of retaliation arising from the discipline imposed on her in 2012 and 2013 and from her resulting termination.

Pretext.

Spirit has also offered facially neutral, non-retaliatory reasons for its imposition of discipline on Le. As such, Le has the burden of establishing a genuine issue of fact exists as to whether those actions were a pretext for retaliation.

To show pretext, Le must produce evidence showing weakness, implausibility, inconsistency, incoherency, or contradiction in Spirit's stated reasons, such that a reasonable jury could find them unconvincing. Debord v. Mercy Health System of Kansas, Inc., 737 F.3d 642, 655 (10th Cir. 2013). In determining whether the proffered reason for a decision was pretextual, the court examines the facts as they appear to the person making the decision, not as they appear to the plaintiff. Moreover, the court does not ask "whether the employer's proffered reasons were wise, fair or correct," but only "whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." Debord, 737 F.3d at 656 (quoting Luster v. Vilsack, 667 F.3d 1089, 1094 (10th Cir. 2011)).

-20-

After reviewing the evidence cited, the court concludes that Le has failed to show a genuine issue as to whether Spirit's explanations for its disciplinary actions is a pretext.

As an initial matter Le offers no evidence of pretext with respect to her August 2011 discipline for poor work performance. She concedes that her work on that occasion was substandard. She cites nothing to show that she was treated differently from other employees who performed poorly. She merely asserts that she was not adequately trained for the work on that part. Such an assertion cannot show pretext, however, at least absent evidence that she was somehow singled out and given work beyond the expected skill level for her position. Le cites no such evidence.

Le has also failed to show a genuine issue of pretext with respect to the five disciplinary incidents that led to her termination. Notably, Le does not dispute that she engaged in the behavior claimed by Spirit on each of these occasions. Nor does she dispute that such conduct is prohibited by Spirit's policies and gives rise to potential discipline. Her claim of pretext is based "on her contention that ... similarly situated individuals who did not engage in protected activity were treated differently." Doc. 46 at 12.

A plaintiff may show pretext by providing evidence that she was treated differently from other similarly-situated employees who violated work rules of comparable seriousness. <u>Smothers v. Solvay Chemicals, Inc.</u>, 740 F.3d 530, 540 (10th Cir. 2014) (citing <u>Kendrick v. Penske Transp. Services, Inc.</u>, 220 F.3d 1220, 1232 (10th Cir. 2000)).

Le's evidence of disparate treatment, however, is lacking and

fails to establish a genuine issue for trial. For example, Le complains that she was disciplined for not wearing safety glasses despite her testimony that "a lot of people don't wear [their] safety glasses." But she cites no instance of a manager overlooking such conduct. Nor does she cite evidence of a similarly situated person who, like her, was cautioned about not wearing safety glasses – without imposition of any discipline – only one week before being found again in the workplace without them. Similarly, she was twice disciplined for viewing non-work related web sites during work hours although she says she saw "a lot of people" doing this. Again, she cites no evidence of a manager overlooking such conduct. And as for whether she was similarly situated to other people who were in fact seen by a manager, she cites no evidence that the managers who disciplined her for this conduct allowed others to engage in the same conduct. "To be 'similarly situated' to the plaintiff, the other employee must 'share the same supervisor' or decision maker." Smothers, 740 F.3d at 540. This is because different treatment does not always indicate pretext. Differences in disciplinary actions may be explained by the fact that the discipline was administered by different supervisors, or that the events occurred at different times when the company's attitudes toward certain infractions were different. Smothers, 740 F.3d at 540 (citation and quotation marks omitted). Insofar as the evidence in the record is concerned, it shows that the managers who disciplined Le did in fact discipline others for engaging in similar conduct.

Le's final instance of discipline occurred when she was found in the lunch room a few minutes before her designated break time. Le

does not dispute that she was in the lunch room early, but claims she was misled by a clock in her shop area that was running fast. If her claim is true then the episode would not appear to be a particularly compelling or fair reason for imposing discipline, let alone discipline leading to termination. But Le cites no evidence to reasonably suggest that Spirit did not in good faith believe its asserted basis for discipline was justified. Spirit has cited uncontroverted evidence that managers saw no one else from her shift in the lunch room. The evidence shows that loud bells announcing the start of the lunch break could generally be heard at the plant, meaning Le's managers could draw a conclusion that she knowingly left early notwithstanding her present assertion that she could not always hear the bells on account of her ear plugs. She also points out that she submitted a corroborating statement to the union from one of her co-workers. Even so, she cites no evidence that any such corroborating evidence was presented to Spirit. Considering the circumstances as they appeared to the Spirit managers who decided to impose discipline, there is no evidence reasonably suggesting that they did not honestly believe and act in good faith upon their belief that Le had violated company policy by coming to the lunch room early. No genuine issue as to pretext has been shown.

Under Spirit's policies Le's termination was warranted by the fact that she incurred the foregoing discipline within one year of the previous four instances of discipline. Given the lack of a prima facie showing of retaliation and/or the absence of a genuine issue as to pretext for Spirit's disciplinary actions, Spirit's motion for summary judgment on Le's retaliation claim must be granted, both as to Title

VII and the KAAD.

C. <u>Intentional infliction of emotional distress; wrongful discharge in violation of public policy</u>.

Spirit seeks summary judgment on Le's state law claims for intentional infliction of emotional distress and wrongful discharge in violation of public policy. Le's response briefs (Docs. 43 and 46) do not address these claims. Regardless, Spirit is entitled to judgment on the claims as a matter of law.

A claim for intentional infliction of emotional distress (or outrage) under Kansas law requires proof of four elements: (1) The conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiffs mental distress was extreme and severe. <u>Valadez v. Emmis Communications</u>, 290 Kan. 472, 476, 229 P.3d 389 (2010). Leaving aside the other elements, Le cites no evidence that could reasonably support the second element. A claim for this tort exists only in the case of "extreme and outrageous conduct" that is "beyond the bounds of decency" and "regarded as atrocious and utterly intolerable in a civilized society." <u>Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman</u>, 267 Kan. 245, 257, 978 P.2d 922 (1999). The evidence here relating to Le's employment dispute falls far short of that exceptionally high threshold.

Le's claim for termination in violation of public policy also fails as a matter of law. A common law claim for this tort is not recognized where state or federal statutes provide an adequate remedy

for the alleged discrimination and retaliation, as Title VII and the KAAD do in this instance. Hysten v. Burlington N. Santa Fe Ry. Co., 277 Kan. 551, 561, 108 P.3d 437, 445 (2004); Flenker v. Willamette Indus., Inc., 266 Kan. 198, 202-03, 967 P.2d 295 (1998) (under the "alternative remedies doctrine," a federal or state statute authorizing a remedy for retaliation will be substituted for a state retaliation claim if the statute provides an adequate alternative remedy).

### V. Conclusion.

Spirit Aerosystems, Inc.'s  Motion for Summary Judgment (Doc. 35) is GRANTED. The clerk is directed to enter judgment dismissing the action on the merits.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp, 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 3 double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this 11th day of August 2014, at Wichita, Kansas.


s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE